**MONMOUTH COUNTY CORRECTIONAL INSTITUTION INMATES et al., Plaintiffs,**

v.

**William LANZARO, Monmouth County Sheriff, et al. and William H. Fauver, Commissioner etc.**

**Civ. A. No. 82–1924.**

United States District Court, D. New Jersey.

Oct. 10, 1984.

As Amended Nov. 14, 1984.

Gerald Boswell, Dept. of Public Advocate, Trenton, N.J., for plaintiffs.

Malcolm V. Carton, Avon, N.J., for Lanzaro et al.

Joseph Maloney, Deputy Atty. Gen., Trenton, N.J., for State of N.J. & Fauver.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This is an action challenging the constitutionality of the conditions of confinement at the Monmouth County Correctional Institution (MCCI or "the jail") in New Jersey. The plaintiffs in this action are a class of inmates at MCCI and defendants are various County and State officials including William Lanzaro, the Monmouth County Sheriff, and William H. Fauver, Commissioner of the New Jersey Department of Corrections.[1] In this case, this court is once again asked to confront one of the "inevitable consequence[s] of this [nation's] war on crime": prison overcrowding and the sometimes "egregious" conditions of confinement which may result. *See Union County Jail Inmates v. Scanlon,* 537 F.Supp. 993, 996 (D.N.J.1982), *rev'd on other grounds sub nom., Union County Jail Inmates v. DiBuono,* 713 F.2d 984, *reh. denied,* 718 F.2d 1247 (3d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984). As in the *Union County Jail* case, all parties agree that MCCI is overcrowded and the only issue is whether the conditions in the jail have fallen below minimum constitutional standards for the confinement of sentenced inmates and pre-trial detainees.

This action in its present form commenced on January 4, 1983 when this court consolidated the complaints of various *pro se* inmates which had been filed during the preceding months of 1982. By Order of this court dated June 6, 1983, the matter was referred to a Special Master, James R. Zazzali, Esq.[2], pursuant to Rule 53(b) of the Federal Rules of Civil Procedure. The Special Master was ordered to "conduct a thorough examination into the totality of the conditions at the Monmouth County Correc-

1. The remaining defendants are as follows: Nelson Stiles, Warden (MCCI), Dr. Jacob Lewis, Physician (MCCI), Harry Larison, Clement Sommers, Frank Self, Thomas Powers and Ray Kramer, and their successors in office, of the Monmouth County Board of Chosen Freeholders.

2. James R. Zazzali is an attorney admitted to practice in the State of New Jersey. He was the Attorney General for this State in 1981–82 and currently practices law with the firm of Zazzali, Zazzali and Kroll in Newark. He also served on Governor Byrne's Task Force to Deal with the Problem of Prison Overcrowding in this State from October to December of 1981.

tional Institution" and to "submit ... proposed findings of fact and conclusions of law as to whether the overcrowded condition of the jail is violative of the Eighth Amendment to the United States Constitution with respect to sentenced inmates or of the Fourteenth Amendment with respect to pretrial detainees...." All parties agreed, in conference with the Special Master, that the proceedings would be limited in scope to plaintiffs' claims of cruel and unusual punishment under the Eighth Amendment and of a denial of due process under the Fourteenth Amendment.[3]

The Special Master and his Assistant, Robert Fagella, Esq., toured the MCCI facility on June 30, 1983 and again, unannounced, on July 15. A first set of hearings were held before the Master on July 20, 21, 25, 26, 27, 28, 29 and August 1, 1983. All counsel were present and were afforded a full opportunity to examine and cross-examine witnesses. Pre and posthearing briefs were submitted. Following these hearings and before any final report had been filed by the Special Master, the United States Court of Appeals for the Third Circuit issued its decision in the *Union County Jail* case, 713 F.2d 984, in which it reversed this court's decision on the constitutionality of the conditions of confinement existing in the correctional facilities at issue therein. Following the *Union County Jail* decision, there arose considerable disagreement between the parties regarding the impact of the Third Circuit's opinion on the governing law.

On September 16, 1983, contending that the *Union County Jail* case necessitated further investigation into the totality of conditions at MCCI, plaintiffs moved this court for an order permitting additional hearings, additional discovery and an extension of time within which the Special Master would be required to submit his report to the court. In support of their motion, plaintiffs also argued that defendants had belatedly raised new issues concerning double-celling and double-bunking at MCCI which had not been addressed at

the hearings. Noting that the proposed remedy of double-bunking had not been raised by the defendants until *after* the conclusion of the hearings, I ordered that hearings be reopened to permit the exploration of issues raised by this proposal. In particular I stated:

> Such exploration may include the full range of discovery techniques under the Federal Rules of Civil Procedure, as well as experts regarding issues such as the physical or psychological effects of double-bunking on the inmates, and the effect of double-bunking on the inmates, and the effect of double-bunking on the jail's physical plant, staff and conditions of confinement....

Transcript of Opinion rendered on September 16, 1983 at 12–4 to 12–12. Further, I ordered that the defendants respond to all outstanding discovery requests and I extended the date on which the Master's report was due. Pursuant to my order, further discovery was conducted and additional hearings were held by the Master on November 16, 17, 18, 21, 22, 23 and December 5, 7, and 10, 1983. The Special Master's Report and Recommendations Concerning Overcrowding at the Monmouth County Correctional Institution was filed on February 10, 1984 and timely objections to the Master's findings were filed by plaintiffs and by State defendants thereafter.

On November 15, 1983, before the additional hearings commenced, plaintiffs moved this court for preliminary injunctive relief. Plaintiffs sought an order of this court requiring defendants to provide all inmates at the MCCI with one hour of out-of-cell recreation daily and prohibiting the practice of requiring inmates to sleep on the floor. State defendants did not contest the relief requested. In fact, Commissioner Fauver had already ordered the county to provide much the same relief which plaintiffs sought in this court. On the uncontested factual record then before me, I concluded that plaintiffs had, to this extent, demonstrated a reasonable likeli-

---

**3.** The complaint also states *inter alia* claims under the Equal Protection Clause of the Four-

teenth Amendment and the damage claims of the individual *pro se* plaintiffs.

hood of success on the merits of their Eighth and Fourteenth Amendment claims and that they would be irreparably harmed *pendente lite* if their motion for injunctive relief was denied. Further, I concluded that the county defendants had failed to show that its interests or the interests of the public mandated a contrary result. Consequently, I ordered "that no pretrial detainee of the [MCCI] shall be required to sleep on the floor with or without a mattress and bedding for more than 48 hours and that no sentenced [inmate] at MCCI shall be required to sleep on the floor with or without a mattress and bedding for more than two weeks. In addition, I order[ed] that all persons confined at the [MCCI] shall receive a minimum of one hour of recreation away from their living space each day." I advised the County to consider the suggestions already made by Commissioner Fauver regarding how this could be accomplished.

On May 3, 1984, plaintiffs moved this court for an order of contempt against the defendants due to their alleged substantial non-compliance with the preliminary injunction which had been entered in this case. Evidentiary documentation and affidavits were submitted by the parties. Oral argument on the objections filed by the parties to the Special Master's Report were heard on the same day. At the close of oral argument, counsel for plaintiffs indicated that he would be willing to withdraw the motion for an order of contempt in light of the pendency of a final decision on the merits of the case.

 This case is presently before me for a final ruling on the merits of the issues referred to the Master for proposed findings of fact and conclusions of law. Rule 53(e)(2) of the Federal Rules of Civil Procedure provides that "[i]n an action to be tried without a jury the court shall accept the Master's findings of fact unless clearly erroneous." *See Kyriazi v. Western Electric Co.*, 647 F.2d 388, 396 (3d Cir.1981); 5A Moore's Federal Practice ¶ 53.12[4] (1984). The Master's findings of fact, therefore, carry a presumption of correctness. The Master's conclusions of law, however, carry no weight with the review-

ing court. *See Levin v. Garfinkle*, 540 F.Supp. 1228, 1236 (E.D.Pa.1982); C. Wright and A. Miller, 9 Federal Practice and Procedure § 2614 (1984); 5A Moore's Federal Practice ¶ 53.12[5] (footnote omitted). Moreover this court has an obligation to review a Master's legal conclusions on a de novo basis. *See Polin v. Dun & Bradstreet, Inc.*, 634 F.2d 1319, 1321 (10th Cir. 1980).

## FINDINGS OF FACT OF THE SPECIAL MASTER

The Master's report describes the MCCI as a "relatively modern one-story detention facility" located in Freehold, New Jersey. Special Master's Report (SMR) at 9. The Master further described the facility as "sprawling, containing several cell blocks and dormitory areas connected by corridors." *Id.* At the outset he concluded that according to any measure the "MCCI has been seriously overcrowded in the last two years, and particularly so since January 1, 1983 ... the evidence is overwhelming that a persistent and pernicious state of overcrowding at MCCI previously and presently exists, though to a lesser degree." SMR at 48. While the population of the MCCI has varied rather dramatically, the Master noted that the peak population of some 600 inmates occurred on March 6, 1983. The Master made the following findings with respect to the impact of this effectively conceded overcrowding on all aspects of inmate life and on the conditions of confinement generally.

With regard to inmate housing, the Master found that severe overcrowding at the MCCI through the summer of 1983 "resulted in substantial numbers of inmates sleeping on the floor in all areas of the facility," including dormitories, dayrooms, cell blocks and "the anterooms of Civil 1 and Civil 2." SMR at 49. At times, out of 40 inmates in one dormitory unit the Master found that as many as twelve to fourteen inmates were sleeping on the floor "both with and without mattresses and sometimes with only a blanket or a sheet." *Id.* The Master further found that inmates had been

"sleeping on tables in the dayroom, in the shower areas ... and in the corridors of the cell blocks" and that at times "numerous inmates have been compelled to sleep without even a mattress for extended periods of time" such as four or five months. The Master found, based on testimony at the hearings, that sleeping space was not assigned and that newly admitted inmates sometimes received bunks while other inmates remained on the floor. The Master found that the failure to assign sleeping space also resulted in the experience of these conditions by both pre-trial detainees and state sentenced inmates alike. Finally, the Master credited the testimony of inmates and corrections officers indicating that sleeping accommodations were the subject of a general free-for-all among inmates in which bunks and mattresses were allocated to "the more powerful or violent inmates" regardless of their current inhabitants or the "seniority" of other inmates. SMR at 50.

Regarding the classification of inmates, the Master noted that all parties agree that sentenced inmates should be separated from pretrial detainees and that those accused or convicted of violent crimes should be separated from non-violent offenders. SMR at 50. The Master found that while the county had attempted to implement a meaningful classification system, "the persistent level of overcrowding continues to preclude an effective use of such a system, and indeed in some instances has caused the overcrowding." Id.

Regarding Medical screening of newly admitted inmates at MCCI, the Master found that overcrowding resulted in inadequate or delayed medical examinations. SMR at 51. Thus there was a risk that inmates carrying communicable diseases could be released into the general population at the jail. This is because the existing medical staff could not keep up with new admissions at MCCI. The Master further found that medical services in general were hampered by the increased population at the jail, causing extended delays in seeing a physician and an absence of available nursing services during night and early morning hours. On these facts, the Master

concluded that overcrowding and understaffing at MCCI have led to conditions which "constitute a hazard to the health of both the individual inmates and the general inmate population." SMR at 51.

The Special Master also found, based on the testimony of expert witnesses for both the state and the plaintiffs as well as the testimony of the Warden and the Assistant Superintendent of MCCI, "that adequate recreation for inmates is an absolutely essential component for maintaining a minimal standard of decency for inmates." SMR at 51. Finding that one hour of recreation per day was necessary regardless of the population at the jail, the Master found that "available facilities and personnel of the institution were such that it would be virtually impossible to provide much more than one half hour per week of recreation for inmates at prior populations if only the existing indoor facility were utilized." SMR at 52. MCCI has a small indoor recreation area with some weight lifting equipment which can be used by about five inmates at one time. This finding was made even without reference to the testimony of inmates that recreation was virtually nonexistent prior to June of 1983.

Regarding outdoor recreation, MCCI has a large yard measuring 81' × 116' (9715 sq. feet) with a basketball court. The Master found that use of the yard has been governed by prevailing weather conditions the availability of correctional officers for supervision and other security factors. The Master found that "[t]hese factors have resulted in inmates generally receiving 1–2 hours per week of outdoor recreation even under optimal conditions..." SMR at 52. This finding was based on the testimony of prison officials regarding the number of hours per day that outdoor recreation was permitted (2½–3 hours), the number of inmates who could use the yard simultaneously (90–100), and the peak population figures of the facility as a whole. At less than peak inmate population and subsequent to this court's order of preliminary injunctive relief, the Master found that the inmates had received as much as 2–3 hours per week of outdoor recreation. Further,

often, no outdoor recreation was provided to inmates during inclement weather including snow, extreme heat or extreme cold. The report concludes that while MCCI officials acted in good faith, overcrowding at the jail and spatial and staffing limitations of the jail were the causes of the inadequate recreational opportunities. SMR at 53.

The Master also found that persistent overcrowding at MCCI has had a "deleterious effect upon visitation opportunities" of the inmates. SMR at 53. Visitation periods per inmate amounted to approximately five to ten minutes at a maximum of three per week. In addition, the Master found the visitor area to be limited, providing no contact area and only large enough to accommodate approximately eight visitors at any one time. SMR at 11. He also found the waiting period for visitors to be excessive. Again, the Master found officials at MCCI to have made "reasonable efforts to accommodate" visitors, however, he found that the limitations of staff and of the physical plant, in light of inmate population, led to an "extremely limited quantity and quality of visitation." SMR at 54.

The Master's Report addressed one last area: the effects of overcrowding on the general quality of life for inmates at the jail. The Report states:

I find that the persistent levels of overcrowding have seriously diminished the quality of life, in terms of available space per inmate, for those individuals who are housed in the various dormitory and cellblock areas. They have been confined to their cells or dormitory wings virtually the entire day, seven days per week, with only 1½–2 hours per day out of their cell blocks in order to take their meals. Even this limited relief from the persistent conditions of confinement in their cells is not true for all inmates, since there is a substantial number of them who are "feed-ins." ... the persistent levels of overcrowding at times has [sic] seriously limited the ability of inmates to utilize the dayrooms for daytime functions. The utilization of the dayroom areas as the sleeping quarters for some inmates, coupled with the total number of individuals incarcerated there, seriously limited the ability of inmates in the dormitories to move from their bunks to the dayroom area. Accordingly, the vast majority of these inmates simply sit on their bunks or mattresses most of the day watching television, reading or pursuing other passive pursuits. Because of poor lighting in some areas of MCCI, even these activities have often been curtailed.

In the Civil I and II cellblocks, these debilitating conditions have been even more extreme. Inmates often do not have a television in parts of this area and they are compelled to sit on their mattresses or bunks, or otherwise remain in extremely cramped quarters, virtually the entire day without any alternative activity. I find that some of these inmates in the cellblocks often cannot obtain access to the toilet facilities which are located in the cells, and that if they are unable to obtain the attention of a guard to unlock the cells so that they may utilize the toilets or urinals, they have on occasion been required to urinate into paper cups and pour their urine down drains which were within inches of their anteroom mattresses. I further find that on many occasions some toilets and sinks in the dormitory wings have been inoperable for substantial periods of time. I make no specific finding that this is exclusively the result of overcrowding, but take note of the fact that such disrepair, although common in all jail facilities whether overcrowded or not, is exacerbated by the greater usage which accompanies larger numbers of inmates, and the difficulty in temporarily moving inmates to other locations while repairs are made.

SMR at 54–55.

As to the spatial dimensions of the living space available to inmates, the parties stipulated to the following. SMR at 9–11. There are four cell block areas at MCCI, each containing eight cells measuring approximately 7' 10" × 6' (47 sq. feet). Each cell block has a corridor, denominated an "anteroom", which is accessible to inmates

during the day and which is approximately 50' × 7' (350 sq. feet). There are also eight dormitory units for inmates. Each unit is 36'7" × 17'6" (640.21 sq. feet) inclusive of a toilet area (26.13 sq. feet) and a sally port (44.44 sq. feet). The net square footage of the dormitory unit is, thus, 569 square feet. The day room areas, adjacent to each dormitory unit are 17' 6" × 12' 9" (223.13 square feet) which includes tables. There are also two other dormitories known as "trustee" dormitories each measuring 41' 4" × 10' 10" (409.7 square feet).

There are two additional cell block areas denominated Civil-1 and Civil-2. Civil-1 contains six cells each 12' 10" × 6' 9" for a total square footage of 86.6 square feet. The anteroom outside the cells in Civil-1 is 43' 4" × 6' 9" (292.5 sq. feet). Civil-2 contains twelve individual cells and is used to house inmates who cannot be released into the general population. Two of the cells are 9' 8" × 6' (58 sq. feet) with an anteroom of 12' 9" × 9' 10" (125.33 sq. feet) and eight other cells are 11' 10" × 6' 9" (86.6 sq. feet) and are divided into three sections. The anterooms outside these cells vary in size. The final two cells of Civil-2 each measure 7' 10" × 6' (46.98 sq. feet) with an anteroom of 13' 7" × 8' 10" (119.91 sq. feet).

In the basement of the facility there are two "holding tanks" each measuring 20' 10" × 10' 9" (224 sq. feet). An adjacent area known as the "DRC tank" is 20' × 11' (250 sq. feet). Three additional single cells in the basement are 9' × 6' each (54 sq. feet) and there are two isolation cells each 9' 8" × 6' (57 sq. feet).

In light of the square footage of the dormitory units, the Master found that when the male population was in the vicinity of 550, 35–40 inmates were confined in each of eight units. This resulted in 15–18 square feet of sleeping space and 22–25 square feet of day space per inmate. Excluding the space occupied by tables, showers and sallyport areas, available living space drops by approximately two additional square feet. Living space is also reduced by the amount of space occupied by inmates who have been sleeping in day areas.

Additionally, the MCCI facility has two dining rooms which seat approximately 132 inmates. It also has a limited law library containing basic legal volumes and about 1,000 non-legal books. There is also a classroom utilized on weekdays to assist inmates in obtaining their high school diplomas, an area for medical examinations and a commissary.

In his Report, the Special Master noted that ongoing construction at MCCI will, when completed, substantially change the existing physical plant. The Master also noted a number of positive developments which have occurred at MCCI since the filing of the consolidated complaint. Foremost among them has been a "substantial reduction" in the inmate population. The population was approximately 400 at the time the Report was filed. SMR at 46. Conditions of confinement at the jail have improved accordingly, particularly sleeping accommodations.

## CONCLUSIONS OF LAW OF THE SPECIAL MASTER

Applying the standard ennunciated by the Supreme Court for pre-trial detainees in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) and its progeny, the Master concluded that viewing the totality of the conditions at MCCI, those conditions amounted to "punishment" in that they were "excessive" even though rationally related to purported penological purposes. *Id.* at 538, 99 S.Ct. at 1873; SMR at 58–64. The Master made several specific conclusions in this regard. He concluded that "sleeping on a concrete floor without a mattress is 'pain' and 'punishment'" and that "no circumstances short of an extreme, unavoidable and limited emergency could even justify requiring inmates to sleep with only a sheet on the floor for any period of time without a mattress." SMR at 59–60. The Master also concluded that "compelling pre-trial detainees to sleep on mattresses placed on the floor for any period of time except in periods of emergency constitutes punishment" in violation of the due process clause of the Fourteenth

Amendment. SMR at 60, when viewed in light of the accompanying circumstances at MCCI. The Report states that "[s]pecifically, sleeping on mattresses in shower areas or cell corridors for any period of time exceeding two days rises to the level of an unconstitutional deprivation for this group of inmates." *Id.*

After reviewing the spatial dimensions of the cell blocks, anterooms, day rooms and dormitories, the Master further noted that while limited square footage is not *per se* unconstitutional, "even the state concedes that maximum services, recreation and activity would be required to make such conditions constitutionally palatable." SMR at 62. The Report states that "the evidence indicates [that] precisely the contrary occurred...." *Id.* Pointing to the "virtually nonexistent" indoor recreation facilities at MCCI, the Master concluded that what little was available fell "far short of any constitutional standard when coupled with available square footage of living area," the underutilization of the outdoor recreational yard at MCCI, the limited opportunity for visitation, and the limited out of cell time which results from the size of the library, the classroom and the dining rooms. In sum, the Master concluded that "the totality of circumstances has resulted in unconstitutional punishment of pre-trial detainees who have been incarcerated at MCCI." SMR at 64.

Applying the standard ennunciated by the Supreme Court for sentenced inmates in *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) and its progeny, the Master concluded that some of the very same conditions constitute cruel and unusual punishment [4], although he noted that sentenced inmates "may probably be required to endure such conditions of confinement for a longer period of time...." SMR at 64. Specifically, the Master drew the following conclusions from the evidence presented. Regarding the practice of permitting inmates to sleep on the floor with no mattress, the Master concluded that such a practice is "shocking

to the conscience of any observer" and is, in any event, "substantial privation and wanton punishment." SMR at 64.

Regarding the practice of requiring sentenced inmates to sleep on the floor even with a mattress, the Master concluded that while "less repulsive" the practice "cannot pass constitutional muster." SMR at 65. The Report further states:

Viewed in light of contemporary standards of decency for inmates, this practice is dehumanizing, unsanitary, humiliating and repulsive when practiced for any period of time in excess of one or two days even under the most dire circumstances. Whether an inmate sleeps on a mattress beneath a bunk of another, in a cell anteroom, on a dayroom table, or in a shower stall, with or without rodents crawling over him, the practice is simply wrong, lacks any penological purpose, and 'deprives inmates of the minimal civilized measure of life's necessities', *Rhoades [Rhodes] v. Chapman,* 452 U.S. at 347 [101 S.Ct. at 2399]."

SMR at 65. Noting that the practice is "a virtually unrelenting aspect of life for many inmates," and that the "clutter of bodies" has an impact on conditions generally, the Master further explained that it "substantially limits the opportunity for daytime space for all inmates in those areas not designed for sleeping, exacerbates prison tensions, creates resentments and fighting over this barest of necessities, and poses a health hazard to all who are confined there." SMR at 66.

Pointing to the minimal amount of recreation provided to inmates particularly during the winter, to the limited living space and visiting opportunities and to the basic condition of overcrowding itself, the Master concluded that "[r]egardless of the exigencies of prison management ... these are additional facts which point, quite conclusively, to the unconstitutional nature of the conditions of confinement, even with reference to sentenced inmates, under the totality of circumstances of inmate life at

---

4. The Master considered the same conditions because MCCI does not separate pre-trial detain-

ees from sentenced inmates. *See* Master's Findings of Fact *supra.*

MCCI at the higher population levels which have historically existed at the facility." SMR at 67.

### RECOMMENDATIONS OF THE SPECIAL MASTER

The Special Master made the following remedial recommendations:

1. That an order be entered prohibiting the County from requiring any inmate to sleep on the floor without a mattress for any period of time.

2. That an order be entered prohibiting the County from requiring any inmate to sleep on the floor with a mattress except in exigent circumstances still not to exceed three days.

3. The County should be ordered to make specific sleeping space assignments to permit the court to monitor compliance with the orders suggested above.

4. The County should be required to insure that sentenced inmates rather than pretrial detainees use mattresses on the floor whenever necessary.

5. That the County be ordered to take immediate steps to improve indoor and outdoor recreation opportunities for inmates on a regular basis.

6. That the County be ordered to take steps to improve visitation time and to provide for contact visits with inmates.

7. That the County be ordered to hire at least one additional nurse at any cost.

8. That the County provide better lighting and ventilation in the areas of MCCI where inmates are housed. In addition, smoke detectors should be installed.

9. Medical screening should be improved and the library should be made complete.

10. All parties agree that the population in the women's wing should not exceed 40 inmates.

11. The Master further recommends that a population cap of 304 male inmates and 40 female inmates be imposed: 44 male inmates in each dormitory (176 total), 52 male inmates in the trustee wing, 20 male inmates in the combined Civil I and Civil II, 56 inmates in the cell blocks in A-wing and B-wing. The Master noted that the population could constitutionally be increased by 10% if recreation was substantially expanded "beyond one hour per day." SMR at 92.

### OBJECTIONS TO THE FINDINGS AND CONCLUSIONS OF THE SPECIAL MASTER

The plaintiffs and the State defendants filed objections to the Master's findings and conclusions. By letter to this court dated March 16, 1984, the County of Monmouth confirmed that it would not be filing any objections to the Master's Report.[5]

In the introduction to its objections, the State notes that "[w]ith some exceptions, [it] does not quarrel with the specific fact findings of the Special Master." Commissioner Fauver's Objections (CFO) at 1. State defendants do raise two objections: first, while the State "does not argue in defense of the former 600 inmate population at the jail, or of certain conditions or procedures that were prevalent at that time", CFO at 4, it contends that present conditions at the jail, not adequately considered by the Master, are not unconstitutional. Second, the State contends that the Master's recommended population cap of 304 male and 40 female inmates is not constitutionally mandated and that instead the appropriate constitutional maximum population is 380 male and 40 female inmates.

In objecting to the Master's Report and Recommendations, the State defendants make the following remedial proposals:

1. That an appropriate population level for MCCI as presently constructed would be approximately 420 inmates, consisting of 40 female inmates and 380 male inmates. The female inmates to be housed in the Female Wing, and the male inmates to be housed as follows: 28 inmates in each of the 8 regular dormitories, 64 inmates in the trustee dormitories, and 2 inmates per cell (i.e., double-celled) in each of the 32 general popula-

---

**5.** The County has thereby joined in the Master's recommendations to this court.

tion cells and the 14 civil area cells. In the event there should be state-sentenced inmates in the MCCI at the time of the Special Master's Report which cause the population to exceed 420, that the Commissioner of Corrections be permitted to remove them from the institution, in stages, over a reasonable time period.

2. That the MCCI not require inmates to sleep on the floor without mattresses except in emergent circumstances and then only for a limited period of time.

3. That MCCI provide recreation or exercise to the inmates in the institution's outside yards on a regular basis of about one hour every day per inmate.

4. That MCCI examine the feasibility of indoor recreation using both of the institution's dining halls, and of outdoor recreation using the courtyards not currently in use.

5. That MCCI assign its inmates to specific bunks within the institution and enforce disciplinary procedures to prevent inmate vandalism or misappropriation of fellow inmates' mattresses.

6. That the MCCI perform an intake medical exam on each inmate within a reasonable time following his admission.

7. That the MCCI hire a nurse to fill the midnight to eight a.m. shift vacancy, or hire a trained technician in lieu thereof.

8. That a smoke detector system be installed.

9. That lighting and ventilation in Civil-1 and Civil-2 be improved.

Plaintiffs make the following objections to the findings and conclusions of the Master. First, they object to the Master's statement that the "physical plant *per se* is not at issue." SMR at 9; Plaintiffs Objections (PO) at 6–8. In particular they cite to the testimony of Dr. Powitz regarding ventilation, lighting, heat, smoke and fire detection, emergency exit signs, sanitary facilities, and hot water. Second, plaintiffs point to several errors in the Master's description of Civil-1 and Civil-2 cell blocks, and in the square footage of the so-called

trustee wing. Third, plaintiffs contend that "[t]he most obvious, and we suggest fatal, defect in the Master's findings of fact is his *total* disregard of the written admissions ... of the County and State defendants." PO at 33 (emphasis in original); *see infra.*

Plaintiffs further contend that the Master made a variety of additional clearly erroneous statements and omissions in his findings of fact. They note that the Master failed to find that the jail lacked adequate nursing staff, that the number of hours of recreation provided to inmates was far smaller than the Master found even as calculated from the figures contained in the Report itself, and that MCCI officials never made "reasonable efforts" to increase visitation opportunities as the Master suggests at page 54 of his Report. PO at 39–41. Plaintiffs further object to the Master's proposed remedy for the inadequacies in inmate living conditions in that it fails to remedy the conditions. PO at 42–44. Finally, plaintiffs object to certain statements made by the Master in the section of the Report containing conclusions of law, to the Master's proposed remedy as well as to the recommended maximum capacity of MCCI.[6]

Having described the Master's findings and the positions of the parties, I turn now to the legal standards which govern my determination of the minimum of services and maximum population which are constitutionally mandated at MCCI.

## CONSTITUTIONALITY OF CONDITIONS AT THE MCCI

At the outset I note that the Master's conclusion that the conditions of confinement for all inmates at MCCI were unconstitutional at times of peak population does not appear to be contested by the defendants. As noted *supra*, the County defendants do not object to the findings of fact or conclusions of law set forth in the Special Master's Report. The County thus con-

---

6. Because I have determined that the Master's proposals, if followed, represent the constitutional minima beyond which this court can order no further relief, I will not address the plaintiffs proposals which, though ideal, are not constitutionally mandated.

cedes that the conditions of confinement at MCCI are or have been unconstitutional and accepts the Master's proposed remedial measures and population cap for the facility. The State defendants also concede that at peak population (some 600 inmates) conditions at the MCCI were unconstitutional or at least they do not contest the conclusion that they were.[7] I turn now to a review of the objections of the parties and to the findings and conclusions of the Special Master.

## A. The Applicable Legal Principles

■ The teachings of the Supreme Court establish that conditions of confinement which may be constitutional for sentenced inmates under the Eighth Amendment may be unconstitutional for pre-trial detainees under the Fourteenth Amendment. *Compare Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) with *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Because the MCCI detention facility houses pretrial detainees and sentenced inmates, it is necessary to consider the principles of law which govern the conditions of confinement for both categories of inmates.[8]

The standard governing the due process rights of pre-trial detainees was articulated by the Supreme Court in *Bell v. Wolfish, supra.* In that case, the Court found that "the proper inquiry [regarding conditions of confinement of pre-trial detainees] is whether those conditions amount to punishment of the detainee" in violation of the due process clause of the Fourteenth Amendment. *Id.* at 535, 99 S.Ct. at 1872. Citing to the factors identified in *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963), the Court concluded that it "must decide whether the disability is imposed for the purpose of punishment or whether it is an incident of some other legitimate gov-

ernmental purpose," and whether it "appears excessive in relation to the alternative purpose assigned [to it]." *Bell,* 441 U.S. at 538, 99 S.Ct. at 1873. The Court determined that a condition or restriction which was excessive, arbitrary or purposeless in relation to asserted state goals amounted to punishment and to a deprivation of liberty without due process of law. *See id.* at 539, 99 S.Ct. at 1874. In particular, the Court further defined an "excessive" condition by stating that:

> ... confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment.

*Id.* at 542, 99 S.Ct. at 1875. Finally, the Court cautioned that "effective management of the detention facility ... is a valid objective that may justify imposition of conditions and restrictions ... and dispel any inference" of punitive intent and further cautioned that courts should "ordinarily defer" to the professional expertise of corrections officials in such matters. *Id.* at 540, 99 S.Ct. at 1874.

■ Allegations that overcrowding has resulted in conditions which amount to punishment of pre-trial detainees have generally been tested by an examination of the effects of overcrowding on the totality of conditions of inmate life. *See, e.g., Lareau v. Manson,* 651 F.2d 96 (2d Cir.1981); *Campbell v. Cauthron,* 623 F.2d 503 (8th Cir.1980); *see also Rhodes v. Chapman,* 452 U.S. 337, 364, 101 S.Ct. 2392, 2408, 69 L.Ed.2d 59 (1981) (Brennan, J. concurring). In *Union County Jail,* the Third Circuit embraced this approach noting that while "cramped and overcrowded" conditions of detention could amount to punishment,

---

**7.** As noted *supra,* Commissioner Fauver has stated that he "does not argue in defense of the former 600 inmate population at the jail, or of certain conditions or procedures that were prevalent at that time." CFO at 4.

**8.** MCCI houses individuals unable to post bail after arrest, individuals who have been sentenced by the municipal courts of Monmouth County and the Superior Court of New Jersey for terms not exceeding twelve months and individuals who have been sentenced to state prison.

"such a conclusion must be based on a qualitative and not a quantitative assessment of the resulting environment." 713 F.2d at 996. In short, an analysis of the square footage of sleeping or living space per inmate cannot alone support a conclusion that conditions are unconstitutional under the standard described *supra. Id.* Similarly, that a particular condition of confinement passes constitutional muster in the context of the totality of surrounding conditions at one facility does not mean that the same condition, even somewhat improved, will necessarily be found to be constitutional in the context of the totality of surrounding conditions existing at another facility. The entire record must be scrutinized with care.

■ The Supreme Court considered the constitutional limit on the conditions of confinement of sentenced inmates imposed by the Eighth Amendment in *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Noting that what constitutes cruel and unusual punishment under the Amendment must be drawn "from the evolving standards of decency that mark the progress of a maturing society," *id.* at 346, 101 S.Ct. at 2399 quoting *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), the Court set forth the standards for determining "when the conditions of confinement compose the punishment at issue." *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399. To be constitutional under the strictures of the Eighth Amendment, "[c]onditions must not involve the wanton or unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment...." *Id.* (citations omitted). The Court further explained that conditions which result in "unquestioned and serious deprivations of basic human needs" or which "deprive inmates of the minimal civilized measure of life's necessities" constitute cruel and unusual punishment. *Id.* (citations omitted); *see also Union County Jail,* 713 F.2d at 997. Courts have recognized that food, medical care, sanitation, security, clothing, and habitable shelter are the sorts of basic needs of which even sentenced inmates may not constitutionally be deprived. *See, e.g., Rhodes,* 452 U.S. at 348–49, 101 S.Ct. at 2400–01; *Hutto v. Finney,* 437 U.S. 678, 681–83, 98 S.Ct. 2565, 2568–70, 57 L.Ed.2d 522 (1978); *Battle v. Anderson,* 564 F.2d 388 (10th Cir.1977).

■ As in applying the legal standards governing the confinement of pre-trial detainees, a court must "consider the totality of the circumstances relevant to determining whether conditions have fallen" below constitutionally mandated levels for sentenced inmates. *Union County Jail,* 713 F.2d at 999; *see Hoptowit v. Ray,* 682 F.2d 1237, 1247 (9th Cir.1982); *Union County Jail,* 537 F.Supp. at 1008, *rev'd on other grounds,* 713 F.2d 984.

### B. The Factual Record

The Master was presented with an extensive and appalling factual picture of the conditions of confinement at MCCI. Many of the most egregious conditions appear to be an indirect if not a direct result of overcrowding at the facility. With a few exceptions and qualifications set forth below, I do not find the Master's findings of fact in this regard to be clearly erroneous and I have decided to adopt them pursuant to Rule 53(e)(2) of the Federal Rules of Civil Procedure.[9]

■ Based on a careful review of the evidence and the written objections and oral arguments of the parties, I have decided to modify the Master's findings of fact as follows. First, the Master failed to set forth the extent of the defendants' admissions regarding the conditions of confinement at MCCI. The following facts were admitted by State and/or County defendants:

"(1) Both State and County defendants admit that the eight single cells located in Wings A–1, A–2, B–1, B–2 are 'suitable and equipped to house only eight inmates.'

---

**9.** In an effort to avoid unnecessary repetition, I will not set forth the findings made by the Master a second time. Instead, I incorporate the discussion of the Master's findings from above and set forth only modifications of these findings below.

Plaintiffs Exhibit Nos. 34 and 35 at ¶ 21 (hereinafter P. 34 & 35 at pp. 21).

"(2) Both the State and County defendants admit 'that usually one or more of the plumbing fixtures in each dorm is out of order at any one time.' (P. 34 & 35 at pp. 41).

"(3) In many of the dorms there are beds actually touching, between which there is no space at all. (*See* P. 1, Ex. I; P. 34 & 35 at pp. 44).

"(4) Both the State and County defendants admit that usually one or more of the plumbing fixtures in the trustee dorms is out of order at any one time. (P. 34 & 35 at pp. 45).

"(5) Both State and County defendants admit that the three basement holding units are 'constructed, suitable, and equipped only to provide a temporary holding area for inmates awaiting placement in the jail's housing units because they lack windows and each have only one unshielded toilet.' (P. 34 & 35 at pp. 50).

"(6) The State defendant admits that the jail does not have an adequate system of fire protection. (P. 34 at pp. 60–62).

"(7) The State defendant further admits that the jail's floors and furnishings are not kept clean, dry, free of hazardous substances, or in repair by the County defendants; specifically, floors of the corridors, cells and dorms are often dirty, wet, littered and strewn with mattresses, all of which interfere with the adequate cleaning of the floors and furnishings, and create health and safety hazards. (P. 34 at pp. 65).

"(8) The County defendant further admits that the jail is not properly heated or ventilated such that temperature and humidity levels in summer and winter result in great discomfort, and increased tension and hostility among inmates and between officers and inmates. (P. 35 at pp. 66).

"(9) The County defendants admit that the Civil II anterooms used for housing inmates have no effective means of ventilation, air circulation or of obtaining natural light. (P. 35 at pp. 67).

"(10) The County defendants further admit that because windows at the jail do not close properly or are broken, plastic has been placed over some windows and that this practice prevents proper ventilation and makes the air stale and foul-smelling. (P. 35 at pp. 69).

"(11) The State defendant admits that showers, toilets and urinals at the jail have been inoperable for considerable periods of time and that inmates must use newspapers to cover toilets which are not in use. (P. 35 at pp. 72).

"(12) *Classification.* The County defendants admit that the severely overcrowded conditions at the jail prevent inmates from being classified according to any criteria necessary for inmate safety, security and health. (P. 35 at pp. 76). The State defendant similarly admits that inmates are not classified at the jail according to any of the criteria necessary for inmate safety, security and health. (P. 34 at pp. 76). There is no written plan for the classification of inmates, nor is there a classification manual in effect at the jail. (P. 34 at pp. 77). The State defendant admits that the absence of a working classification system prevents inmates from receiving an appropriate level and kind of custody, housing assignments and program participation; resulting in greater restraints on the liberty and movement of inmates. (P. 34 at pp. 78). Both County and State defendants admit that separate jail housing areas do not exist for inmates awaiting classification. (P. 34 & 35 at pp. 79).

"(13) *Medical Services.* The County defendants admit that the jail's medical department 'is over-utilized and unable to perform adequately.' (P. 35 at pp. 96). The County defendants further specifically admit that overcrowding at the jail has made the amount of time which defendant Dr. Lewis spends at the jail 'entirely insufficient to meet the inmates' routine and emergent medical needs.' (P. 35 at pp. 92). The State defendant also admits that the space and equipment provided for primary health care delivery by the jail is inadequate to meet the needs of the inmates presently confined at the jail; in particular,

the examining rooms at the jail are inadequate in size and equipment for their purposes. (P. 34 at pp. 97). The State and County defendants further admit that medical facilities at the jail are inadequate for providing living quarters for ill inmates who require separation from the jail's general population. (P. 34 at pp. 98). The County defendants further admit that medical facilities at the jail are inadequate for handling medical emergencies. (P. 35 at pp. 98). Since 1978 the DOC has recommended that new admissions be housed separately until after a physical examination has been completed. (P. 34 & 35 at pp. 154). In 1983, the DOC further recommended that the jail expand the daily sick call to enable more inmates to be seen by the physician. (P. 34 at pp. 169).

"(14) *Mental Health Services.* The County defendants admit that the jail holds a considerable number of inmates with known or observable mental or emotional problems, some of whom require close observation to protect them from self-mutilation or to protect them and others from assault. (P. 35 at pp. 104). The County defendants also admit that these inmates with known or observable mental or emotional problems are housed in close, cramped quarters, and that many of them sleep on the floor near other inmates. (P. 35 at pp. 105).

"(15) *Physical Exercise.* The State defendant admits that inmates at the jail are not provided with sufficient opportunity for physical exercise each day outside of the housing unit to maintain their health and well-being. (P. 35 at pp. 116). The County and State defendants admit that with 'very little exception' inmates only have the opportunity to engage in sedentary activities within the confines of their living units. (P. 34 & 35 at pp. 122). Moreover, both the County and State defendants admit that indoor recreation is limited to such things as reading, playing cards, or watching television, 'which do not and cannot substitute for an opportunity for active physical exercise.' (P. 34 & 35 at pp. 123). State defendants admit that the light available in the anteroom areas of the civil wing is not even adequate for reading. (P. 34 at pp.

124). Both the County and State defendants admit that the Department of Corrections in 1983 recommended that the jail provide each inmate with the opportunity for *at least* one hour of daily recreation. (P. 34 & 35 at pp. 152).

"The State defendant further admits that the jail does not maintain a program to provide inmates with an opportunity for regular exercise and active recreation. (P. 34 at pp. 117). The State defendant admits that an outdoor recreation area is available, but is not regularly used even in the summer. (P. 34 at pp. 120). The County and State defendants admit that the outdoor recreation area is not regularly used because in hot, cold, or inclement weather correctional officers are not assigned to guard posts for this area on the roof of the building. (P. 34 & 35 at pp. 121). The State defendant admits that the only indoor exercise area is a small room containing weight-lifting equipment and a universal gym that can accommodate a maximum of five people at a time. (P. 34 at pp. 118.)

"Since 1978, the State and County defendants admit that the DOC has recommended that the jail install double security fences on the roof of the administration building to facilitate an increase in recreational opportunities for inmates. (P. 34 at pp. 150). The defendants further admit that the DOC has repeatedly recommended that the jail construct an indoor gym or auditorium to provide inmates with year around physical exercise; specifically, in 1980 and 1983 the DOC recommended that the existing outdoor recreation yard be converted into an indoor gymnasium or auditorium to provide year round physical exercise for inmates. (P. 34 & 35 at pp. 151).

"(16) *Visitation.* The County defendants admit that visits are limited to five or ten minutes for each visit. (P. 35 at pp. 141). Both defendants admit that the jail only provides three visiting days each week, and only three hours for visiting on each of these three days, (P. 34 & 35 at pp. 140), for a total of nine hours for visiting. Only eight male visiting booths exist at the jail. (P. 34 & 35 at pp. 140). Thus, only 72

'booth-hours' of visiting time is possible during any week to provide visits for the entire population of the jail. The State defendant further admits that on visiting days visitors must come to the jail 'long before visiting hours begin' to obtain a place on the 'lengthy waiting lines.' (P. 34 at pp. 142).

"The State defendant admits that inmates are denied a sufficient opportunity to sustain meaningful contacts with family members or friends during the period of their incarceration at the jail. (P. 34 at pp. 143).

"(17) *Work.* Both the County and State defendants admit that most inmates at the jail are not afforded the ability to work in productive occupations consistent with their health, strength and mental capacity. (P. 34 & 35 at pp. 135). The State defendant admits that the lack of adequate work has 'a seriously deleterious consequence: inmates are deprived of an important way to keep their mind and body occupied and engaged in productive work away from the confines of their living units.' (P. 34 at pp. 135)."

The facts admitted in defendants' answers to plaintiffs' Request for Admissions recited above have been "conclusively established" pursuant to Rule 36(b) of the Federal Rules of Civil Procedure and should, consequently, be incorporated into the findings of fact made by the Master and adopted by this Court.

Second, the Master's conclusion that the physical plant of MCCI was not in issue is, as plaintiffs contend, clearly erroneous. While the Master's recommendations address the condition of the physical plant at MCCI as revealed by the testimony, he failed to make findings of fact in this regard.

A review of Dr. Powitz's testimony and the admissions made by both State and County defendants leads me to add the following findings of fact to those set forth in the Master's Report. Ventilation in many areas of MCCI in which inmates are housed is utterly inadequate. The jail contains a "passive system" which depends on outside air movement and the relative inside and outside temperatures in order to function. Lighting at MCCI in all cells and in most areas of the dormitories is inadequate and subjects inmates to a risk of accident or injury as well as creating a hindrance to recreational reading. The heating system at the jail is also "passive" and results in unhealthy, uneven and highly variable temperatures. The jail has an inadequate system for the protection of inmates against fire and other emergencies. Further, hot water is not provided regularly and the existing sanitary facilities are in frequent disrepair due in part to overuse and overcrowding.

A third matter of contention regarding the Master's findings is the precise nature of improvements which have occurred at MCCI since the filing of this action and the entry of this court's order of preliminary injunctive relief. It is clear, as the Master noted, that a substantial drop in population has occurred at the jail since the peak periods in 1983. According to the most recent communication from Warden Stiles, Letter to Special Master dated July 26, 1984, in recent months male population has averaged 325 but had risen to 373 as of July 24, 1984. With a female population on that date of 29, the total population was 402. These figures are of course substantially lower than the all time high of 600 inmates. With the population decrease, few if any inmates sleep on the floor and medical, housekeeping, laundry and other services to inmates are improved accordingly.

Similarly, recreational opportunities at MCCI have improved. However, I note that they have not improved nearly so much as the State contends. For example, exhibits which accompanied plaintiffs order to show cause why the defendants should not be held in contempt [10] indicate that out of 60 days between January 5, 1984 and March 6, 1984 the recreation log book shows that on 31 separate days the yard

---

**10.** As noted *supra,* this motion was withdrawn pending a final decision on the merits of this case. *See* Transcript of Hearing, May 3, 1984 at p. 8.

was completely closed due to snow, rain, ice or cold weather. *See* discussion regarding the importance of recent developments at MCCI to an analysis of constitutionality *infra*.

### C. *Discussion*

 Before proceeding to a discussion of the conditions of confinement at MCCI in light of the foregoing legal principles, I first address the State's contention that improved conditions at the jail render a conclusion of unconstitutionality and a court ordered equitable remedy improper.[11] I am not persuaded by this argument. If conditions at the jail were unconstitutional at one time during the pendency of this action or prior to its commencement and within the applicable statute of limitations, then a legal basis for equitable relief exists *even if* the facility passes constitutional muster at the present time.

The only exception to this would be if conditions were so improved as to render the controversy moot and the case non-justiciable under Article III standards. Where there is a "reasonable expectation" that the unconstitutional conditions at the facility may recur, the mere fact that conditions have improved, even if to the point of complying with the mandates of the Constitution or a prior court order, does not render the case moot. *See Bell v. Wolfish*, 441 U.S. 520, 543 n. 25, 99 S.Ct. 1861, 1876 n. 25, 60 L.Ed.2d 447 (1979); *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953).

In this case there is unquestionably such an expectation. Many if not most of the conditions of confinement of which plaintiffs complain are related to overcrowding at the jail. Population at the jail has ranged from figures in the 300's to the peak of 600 inmates. The numbers of inmates housed at MCCI are determined by such factors as crime rate (to some degree a seasonal variant), congestion in the state criminal trial courts, and the rate of transfer of state sentenced inmates into the state prisons. These factors are, to differ-

ing degrees, beyond the control of the defendants and the likelihood that population figures will once again reach figures close to 600 is substantial. This is particularly true in light of the ongoing state-wide prison overcrowding crisis which exists in this state. *See Worthington v. Fauver*, 88 N.J. 183, 193, 440 A.2d 1128 (1982). Consequently, I do not find this case to be moot and improved conditions have no further relevance to the legal liability of the defendant.

What is important, however, is whether improvements at MCCI represent the constitutional minima and the outer bounds of any permissible remedial order of this Court. If the improvements represent the constitutional minima, then this court could order no more than that the defendants maintain the status quo at MCCI. *See* discussion of remedies *infra*. If these improvements do not render MCCI constitutional for the incarceration of both pre-trial detainees and sentenced inmates, this court must determine whether the constitutional minima are embodied in the remedies and population cap proposed by the State, the Master or the plaintiffs to this action.

#### 1. Pre-Trial Detainees

 The Special Master found and no party to this action disputes that "there has been [no] intention on the part of MCCI officials or any other defendants ... to 'punish' pre-trial detainees." SMR at 58. Further, the Master found that the challenged conditions of confinement at MCCI "are virtually inescapable adjuncts of the attempts of prison officials to house inmates at the facility and manage the institution in a secure manner." SMR at 59. This conclusion is not seriously disputed and thus the central issue in this case regarding pre-trial detainees is whether the conditions at MCCI, even with the State's proposed remedies in place, would require these inmates to endure "genuine privations and hardship over an extended period of time," *Bell*, 441 U.S. at 542, 99 S.Ct. at 1875, so as to render them "excessive" and

---

**11.** The State does not elaborate on the legal basis for its contention that the Master's conclu-

sions of unconstitutionality are erroneous because conditions at MCCI have improved.

to lead to the conclusion that the conditions amount to punishment. I find that they would.

Based on my review of the totality of the conditions of confinement at MCCI, I find that implementation of the Commissioner's proposed remedy would fail to safeguard the constitutional rights of pre-trial detainees at the facility. A fully double-celled facility at a population of 420 inmates with mattresses, daily recreation, sleeping assignments, medical screening, an additional nurse, smoke detectors and improved lighting and ventilation would be neither constitutional nor feasible under the standards ennunciated by the Supreme Court in *Bell v. Wolfish* and the Third Circuit in *Union County Jail v. DiBuono.*

In *Union County Jail,* the Third Circuit held that if the State's proposal to double bunk[12] all inmates was implemented, the jail, though cramped and overcrowded, would not be unconstitutional. Reviewing my discussion of the totality of conditions existing in that facility, the Court of Appeals found that double bunking, combined with discharge of the County's obligations under the consent judgment in that case, would "effectively cure all of the conditions that were of particular concern to the Special Master." *Union County Jail,* 713 F.2d at 996–97 (footnote omitted). Noting that the cramped and overcrowded space of confinement would remain, the court stated that promised recreation, visitation and other out-of-cell time would ameliorate this condition sufficiently for constitutional purposes. *Id.* at 996 n. 17. The Court also found the maximum stay at the jail of 60 days for detainees to be important to its conclusion. *Id.* at 997. In conclusion, noting that the question of the constitutionality of a fully double-bunked Union County Jail was "not without difficulty," *id.,* the Court vacated my order that the state re-

move state-sentenced inmates in compliance with New Jersey statutory law and vacated the population cap which I had set for the Union County Jail. *Id.* at 1003.

The record in this case reveals facts which are distinguishable from those before the court in the *Union County Jail* case. First, it is admitted that on a sample date of March 11, 1983, 66% of pre-trial detainees at MCCI had been confined there for over 60 days and half of those inmates (30% of the total population) had been confined at the jail for over 75 days, County Defendants' Answers to Plaintiff's Request for Admissions at ¶ 54, more than two weeks longer than the maximum stay at the Union County Jail noted by the Third Circuit. *Union County Jail,* 713 F.2d at 997.

Second, and more importantly, full double bunking at the Monmouth County facility simply would not "cure" or ameliorate the challenged conditions of confinement found in the record in this case.[13] Many of the challenged conditions in this case are a direct result of overcrowding but would be entirely unaffected by double bunking. As in the *Union County* case, double bunking would indeed "avoid the unsanitary and humiliating practice" of forcing detainees to sleep with or without mattresses on the floor of the jail, *see* 713 F.2d at 996, however, double bunking at MCCI will have little if any affect on the recreational opportunities of inmates at MCCI. In the *Union County Jail* the only space available for "meaningful recreation" was an indoor space which was being used to accommodate inmates. Putting inmates into cells with other inmates would "make it possible for recreational areas at the jail to be cleared and dedicated to their original function." *Id.* at 996.

---

12. The Third Circuit used the term "double celled" to mean two inmates in one general population cell and the term "double bunked" to mean two inmates in one cell each with a "permanent bunk-type bed of his own." 713 F.2d at 994 n. 12. I shall do the same.

13. While the Commissioner's proposals speak in terms of double celling, I understand him to envision double bunking as the terms were used by the Third Circuit. This is because I do not believe that it can be fairly disputed that placing a mattress on the floor for the second occupant of a cell is unconstitutional in this Circuit after *Union County Jail. See* 713 F.2d at 994.

At MCCI, however, the only indoor recreation space is a small weight room which is concededly designed to accommodate five or six inmates at most and has not been used to house inmates. Instead, MCCI is equipped with a large outdoor yard which as noted *supra* is frequently closed due to inclement weather conditions such as extreme heat, cold, rain, ice or snow. While it is not clear exactly how many hours per week each inmate has been able to use the yard, it is clear that due to the closure rate, inmates have not received anything near the one hour per day which the Third Circuit found to be so critical as a mitigating factor for the cramped conditions at the Union County Jail.[14] Given the testimony of MCCI officials that the yard can accommodate at most 100 inmates at a time and the testimony that security and staff limitations result in the yard being open an average of three hours per day and an average of four days per week due to weather conditions, at a population of 420 inmates, each inmate would receive at most three hours in the yard per week. As noted *supra*, no other recreation space is available at MCCI.[15] Moreover, the three hour figure is an average which does not reflect the long cold winter months and rainy spring months during which inmates may receive no recreation for as many as three weeks at a stretch. Thus, at a population of 420 inmates, given the current physical plant at MCCI and all security or staffing limitations, it is impossible for the County to provide the requisite daily one hour of recreation on a year round basis. Counsel for County defendants confirmed this at the hearing before this court on May 3, 1984 when, referring to the State's 420

figure he stated: "With all due deference to Mr. Maloney and the Commissioner, its too high. If Your Honor wants a constitutionally constituted facility. If you want an hour per day recreation ... we can't do it with that figure. It's absolutely impossible." Transcript at p. 22.

█ I read the Third Circuit's opinion in the *Union County Jail* case as holding that where the space available per inmate in an overcrowded detention facility is as small as in that case, one hour of meaningful recreation per day is a constitutionally mandated mitigating factor. *See id.* at 996 n. 17. Though the Third Circuit was not explicit in this regard, on page 996 of the Court's opinion, Judge Garth mentions recreation no less than five times in concluding that the totality of conditions for pre-trial detainees passed constitutional muster at the Union County Jail.[16] The Court's reliance on the promised one hour of recreation is similarly evident throughout the opinion. I note that the Third Circuit is not alone in recognizing the importance of regular exercise and recreation to the physical and psychological health of an inmate population. *See, e.g., Ruiz v. Estelle,* 679 F.2d 1115, 1152 (5th Cir.1982); *Campbell v. Cauthron,* 623 F.2d 503, 507 (8th Cir.1980); *Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979); *Preston v. Thompson,* 589 F.2d 300, 301 (7th Cir. 1978); *Parnell v. Waldrep,* 511 F.Supp. 764 (W.D.N.Ca.1981); *Hutchings v. Corum,* 501 F.Supp. 1276 (W.D.Mo.1980). I further note that neither State nor County defendants contest the conclusion that one hour of recreation per day is constitutionally required. The County filed no objections

**14.** The Master found that inmates had received an average of 2–3 hours of recreation per week after population had decreased to current levels. *See* discussion *supra.*

**15.** I note that Commissioner Fauver has ordered the County to investigate the possibility of using the dining halls for increased indoor recreational space. Warden Stiles has apparently taken steps to implement this proposal. Even if implemented, however, this would not alter my analysis. The large dining hall is approximately ¼ the size of the outdoor yard and the small one is about ⅛ the size of the yard. Presuming

that the dining halls would continue to be used for dining, their use for recreation would not substantially add to available recreational space at the jail in inclement weather.

**16.** On page 996 alone, Judge Garth mentions "the use of an enlarged space;" the "mitigating effects of larger recreational space for at least one hour a day;" "a genuine opportunity for at least one hour of recreation;" the possibility of clear "recreational areas" permitted by double bunking and once again the mitigating effects of "the promised daily hour of recreation." *Union County Jail,* 713 F.2d at 996.

to the Master's Report and the State did not dispute the one hour per day which I ordered in plaintiffs' application for preliminary injunctive relief. *See also* Answers to Plaintiffs' Requests to Admit described *supra.*

As noted *supra,* the County *cannot* provide one hour of recreation per day in an enlarged space away from where the inmates sleep at the State's proposed population cap. Double bunking or double celling at MCCI would not affect this fact because the inadequate amount of recreation is due to weather and staffing limitations and not, as in *Union County,* to inmates sleeping in designated indoor recreational spaces at the jail. However, a reduction in population at MCCI would result in each inmate being able to use the yard more frequently, on average.[17]

The record reveals several other conditions at MCCI which while exacerbated by overcrowding would be unaffected by double bunking. The record shows that visitation opportunities at the jail have been five to ten minutes per inmate three times per week. While it appears from the record that visiting hours at MCCI could be expanded to some degree regardless of population levels, at peak population security and staffing limitations at the facility would restrict the number of visitation hours which could be afforded the inmates.

The record also reflects that MCCI currently lacks any meaningful system for classifying inmates. While officials at MCCI have attempted to implement such a system, overcrowded conditions at the jail have made it impossible to separate sentenced inmates from pre-trial detainees, inmates convicted of violent crimes from those convicted of non-violent crimes, and mentally ill or medically contagious inmates from the general population at the jail. While double bunking could alleviate some of these problems by freeing up corridors and anterooms, full double bunking at the population proposed by the Commis-

sioner would not create a substantial amount of increased sleeping space for inmates. In contrast to the Union County Jail, at MCCI most inmates sleep in dormitories and not in individual cells. Because little additional sleeping space would be created through double bunking, this proposal together with the State's proposed population cap would not enable County defendants to implement a classification system even if one were adopted at MCCI.

The record also reflects that both medical screening and medical services have been inadequate due to overcrowding and a combined lack of staffing during night hours. Both State and County defendants concede this fact.

The record further reflects a variety of other conditions at MCCI which combine their effects to render high population levels at MCCI unconstitutional under the totality of circumstances. Plumbing fixtures are frequently non-functional. Heating is excessive for some inmate areas and inadequate for others. Several areas used to house inmates have no ventilation at all and many areas have lighting that is insufficient to permit the inmates to read. Many of these conditions are also conceded by the parties.

Lastly, there is the sheer lack of space at the facility to accommodate 420 inmates in a constitutionally permissible manner. As in *Union,* if population at the facility is capped at 420, housed as the State proposes, the sleeping and day time living space of each inmate at MCCI will be "admittedly cramped and overcrowded." *Union County Jail,* 713 F.2d at 996 n. 17. While it is clear that the absence of walking space is not in itself of constitutional significance, *see id.* at 995 quoting *Bell v. Wolfish,* 441 U.S. at 543 n. 26, 99 S.Ct. at 1876 n. 26, cramped living space in the absence of one hour of meaningful daily recreation where a "qualitative... assessment of the [overall] resulting environment" indicates that

---

17. For example, at the Master's proposed population of 304 inmates, each inmate could use the yard approximately four hours per week on average. While not ideal, I find that this would pass constitutional muster in light of the possibility of using one of the dining halls as additional indoor recreational space during inclement weather conditions.

inmates are being subjected to egregious deprivations which are largely unrelated to legitimate state interests is constitutionally infirm under the law of this Circuit. *See Union County Jail,* 713 F.2d at 996.

The facts regarding available space per inmate at the proposed maximum population levels are disputed. The figures that have been suggested by the parties are set forth in Appendix A to this opinion.

I am unable to glean from the record the bases for all of these disputed figures, however, the precise square footage per inmate is not critical to a determination of the constitutionality of conditions at the MCCI facility. *See Union County Jail,* 713 F.2d at 995–96. As noted *supra,* a purely spatial analysis without an assessment of the overall quality of inmate life would be in the words of Judge Garth, both "unilluminating and unconvincing" in a matter of constitutional magnitude. *Id.* at 996. Instead, my determination is governed by a consideration of the totality of conditions at MCCI. *See* discussion *supra.* I find the absence of walking space at MCCI, which is and would be created by overcrowding at the facility even were double bunking in place, to be a genuine privation and hardship violative of the Due Process Clause. *See Bell v. Wolfish,* 441 U.S. at 542, 99 S.Ct. at 1875. This conclusion is based not on a quantitative assessment of available space per inmate, but on my review of the full factual record in this case which I find to be distinguishable from the facts in the *Union County Jail* case in several respects.[18] For these reasons, my holding in this case is unaffected by the fact that square footage per inmate at MCCI under the State's proposed population level appears to be somewhat larger than the square footage in the *Union* case.[19]

In sum, an analysis of the totality of conditions at MCCI reveals that even if double celled, pre-trial detainees would be housed in cramped, overcrowded quarters which are only slightly larger than those found in the Union County Jail. They will receive no better than three hours of recreation per week in an enlarged space away from their cell or bed. Any more recreation under the State's proposal would be impossible thus directly contravening the Third Circuit's mandate that one hour per day is a requisite mitigating factor under conditions comparable in other respects to those present in *Union County Jail.* At best, inmates will be away from their cells for dining or visitation an additional one hour per day. Thus inmates will be confined to their sleeping accommodations or to small, crowded corridors or anterooms between 22 and 23 hours per day. Visitation opportunities are rare and short. In direct contrast to the conditions present in the Union County Jail, inmates at MCCI will sit, without meaningful walking space, in dark, over or under heated and inadequately ventilated bed space for these 22–23 hours per day unable to read or function without risk of accident or eye strain. *See Union County Jail,* 713 F.2d at 1001 n. 30 (physical plant not in issue). Detainees may find themselves arms length from inmates convicted of violent crimes and inmates who are physically or mentally ill. At times the toilets are out of order. As many as thirty per cent of these detainees will spend over seventy-five days in these conditions. I want to make absolutely clear that this court has no objection to double bunking at the MCCI facility, as the Supreme Court noted in *Bell,* the Fourteenth Amendment contains no "one man, one cell" principle. 441 U.S. at 542, 99 S.Ct. at 1875. However, double bunking at the State's proposed population cap will change none of the conditions of constitutional concern on the record before me.

On such a record I am compelled to conclude that pre-trial detainees, individuals

---

**18.** In particular, at MCCI one hour of recreation will be impossible at the State's proposed population. *See supra.* Secondly, the physical plant was not in issue in the *Union County Jail* case. 713 F.2d at 1001 n. 30. Here, by contrast, I find serious inadequacies in the heating plumbing, ventilation and lighting of the MCCI facility. *See supra.*

**19.** In *Union* inmates who were double bunked had 19.5 square feet of sleeping space and 30 square feet of living space.

who are presumptively innocent of the crime charged until convicted by a jury of peers, would be subjected to punishment in violation of the Fourteenth Amendment and the standards of *Bell v. Wolfish* if the State's proposed population was permitted to stand. In good conscience, paying due regard to the law of this Circuit in *Union County Jail* and to the constitutional permissibility of double celling, I believe that without a population cap reducing the strain on MCCI staff, resources, and physical space, pre-trial detainees will be forced to endure genuine "privations and hardship." I further believe the totality of conditions to be excessive in relation to the State's interest in effective management of a detention facility which will keep inmates who cannot make bail off the streets pending trial. *See Union County Jail,* 713 F.2d at 992–93; *see also Worthington v. Fauver,* 88 N.J. 183, 440 A.2d 1128 (1982).

It is true that, to the extent conditions are not already improved at MCCI as the State contends, this court could order the County to remedy some of the existing problems at the jail without a population cap, but the stark reality is that the County *cannot* provide 420 inmates with one hour of meaningful recreation per day given the existing physical plant. *See* discussion *supra.* While one hour per day may not be constitutionally required under other circumstances, where the totality of conditions of confinement approach those found in the Union County or Monmouth County jails, the Third Circuit has itself recognized that one hour of daily recreation is critical to the maintenance of a constitutional facility for pre-trial detainees. *See* 713 F.2d at 996.

## 2. Sentenced Inmates [20]

The question before me is whether the conditions at MCCI "alone or in combination" would deprive sentenced inmates of one of life's basic necessities as defined by the cases discussed *supra* even with the State's proposed remedies in place. *See*

*Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399; *Union County Jail,* 713 F.2d at 999.

I find, based on the factual record which has been described *supra,* that state sentenced inmates at MCCI are deprived of basic human needs such as "habitable shelter" and are generally forced to endure conditions which amount to an "unnecessary infliction of pain." In contrast to the *Union County Jail* case, *see* 713 F.2d at 1001 n. 30, the record in this case reveals that "basic physical facilities such as plumbing, heating, ventilation, and showers are inadequate." *See id.* Thus, the facts of this case are closer to those present in cases where conditions have been held to violate the Eighth Amendment such as *Ramos v. Lamm,* 639 F.2d 559 (10th Cir.1980) and *Battle v. Anderson,* 564 F.2d 388 than were those presented to the Third Circuit in *Union County Jail. See* 713 F.2d at 1001 n. 30. In other respects the facts in this case are comparable to those presented in *Union* except that, as discussed *supra,* at the State's proposed population level, inmates cannot be assured of receiving even one hour of daily recreation in an enlarged space on a regular basis.[21] As previously indicated with respect to pre-trial detainees, I accept the Commissioner's proposal that inmates be double-bunked but conclude that implementation of this proposal will not alter the unconstitutionality of conditions at MCCI under an Eighth Amendment analysis.

My conclusion that the conditions of confinement at MCCI violate the rights of sentenced inmates to be free from cruel and unusual punishment under the Eighth Amendment is not based upon my own subjective views. *See Union County Jail,* 713 F.2d at 999 n. 22 (discussing *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399). Instead, it is based upon the learned and carefully considered opinions of expert witnesses who testified before the Master in this case regarding the effects of the depri-

---

**20.** I note that because inmates at MCCI are not classified, *see supra,* sentenced inmates are subjected to precisely the same conditions of confinement as are pre-trial detainees at the jail.

**21.** Once again, I am assuming that the State has proposed double bunking of inmates or, in any event, the bunking of all inmates so as to keep them off the floor at all times except under emergent circumstances.

vations experienced by inmates at MCCI over time on the physical and mental well being of the inmates.[22] Similarly, it is based on evolving contemporary standards of decency which reflect, among other factors, a growing understanding of the importance of recreation to physical and mental health particularly in the context of prison overcrowding and other deleterious conditions. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 274 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984). *Cf.* Lyons, *Researchers Report Even Mild Exercise Helps Prolong Life,* N.Y. Times, July 27, 1984 at A1, Col. 1 ("researchers concluded that sedentary life styles, even among former varsity athletes, lead to heart and lung diseases that shorten lives"). Furthermore, I note that no party to this action disputes these facts. *See* Defendant's Answers to Plaintiff's Requests For Admissions at ¶¶ 116, 122, 123.

Finally, in view of my holding and the remedial order which follows regarding pre-trial detainees and in view of the fact that both classes of inmates are intermixed and thus housed under indistinguishable conditions at the jail, I note that my conclusions regarding sentenced inmates will have little independent effect on my remedial order in this case.

### REMEDY

A District Court has wide discretion in fashioning a remedial order. *See Ruiz v. Estelle,* 679 F.2d 1115, 1144–45 (5th Cir.1982). However, this discretion is not unlimited. *Id.* "[A] court can order only relief sufficient to correct the violation found," *id.* at 1145; *see Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971), and may not "use the totality of all conditions to justify federal intervention requiring remedies more extensive than are required...." *Wright v. Rushen,* 642 F.2d 1129, 1133 (9th Cir.1981); *Union County Jail,* 713 F.2d at 1001. Further, a court may not use its jurisdic-

tional and remedial authority as "a roving commission to impose ... [its] own notions of enlightened policy" on state and local governments or correctional personnel. *Rummel v. Estelle,* 445 U.S. 263, 285, 100 S.Ct. 1133, 1145, 63 L.Ed.2d 382 (1980) (Stewart, J. concurring). In short, in exercising its remedial authority, a District Court must take heed of the interests of local authorities in managing their own affairs, *see Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977), and allow them "primary responsibility for curing constitutional violations," at least in the first instance. *Hutto v. Finney,* 437 U.S. at 687 n. 9, 98 S.Ct. at 2572 n. 9; *see also Union County Jail,* 713 F.2d at 1001–02.

In entering a remedial order in this case, I am mindful of these restraining principles, but I am also mindful of my responsibility to safeguard the rights of inmates at MCCI and the principles of fairness and human decency which on the facts of this case I have concluded are constitutionally mandated. In considering the interests and expertise of state and local authorities, I have carefully reviewed the proposed remedies of all parties to this case and I note that with one exception it appears that all parties (plaintiffs, State and County defendants as well as the Special Master, James Zazzali) have substantially agreed to the relief ordered herein. The sole exception is the precise maximum population capacity to be imposed on MCCI.[23] As noted *supra,* plaintiffs propose 192 inmates, the Master proposes 344 inmates (a figure the County has not objected to) and the State proposes 420 inmates. In entering my order in this regard, I am aware that "only if conditions in the jail could not be rendered constitutional without reduction of the population, would removal of the state prisoners be required as a constitutional remedy." *Union County Jail,* 713 F.2d at 1002. Further, I am mindful of the nearly ⅓ population reduction which has occurred at MCCI since periods of peak popu-

---

**22.** I note that similar expert testimony was not presented in the *Union County Jail* case.

**23.** I note that all parties have proposed a population cap and the dispute lies only in what that number should be.

lation and the substantial improvements which have accompanied this change as well as the ongoing construction program at the jail designed to increase capacity and further improve conditions of confinement.

In view of all of these consideration, I have decided to order that the defendants take the following remedial measures to render conditions at MCCI constitutional under the Eighth and Fourteenth Amendments to the United States Constitution:

1. That defendants take all necessary steps to renovate the MCCI facility particularly with regard to lighting, ventilation, heating and plumbing fixtures.

2. That all inmates be given one hour of meaningful recreation per day in an enlarged space away from their sleeping area except in emergent circumstances but in no event shall any inmate miss more than two days of such recreational opportunity consecutively and that further, MCCI investigate possibilities for indoor recreational space if necessary to comply with this order on a year round basis.

3. That all inmates be given a bed, a mattress and bedding (to be placed where feasible but not so as to restrict day time living space unnecessarily except that inmates may be required to sleep on the floor *with* a mattress in emergent circumstances but in no event without a mattress and in no event for longer than 48 hours (pre-trial detainees) or two weeks (sentenced inmates).

4. That a meaningful classification system for inmates be developed and implemented.

5. That visitation hours be substantially increased.

6. That an additional nurse be hired and that medical screening be done prior to release of any inmate into the general population.

7. That the population at MCCI not be permitted to exceed 344 inmates (40 female, 304 male) and that State and County defendants take whatever means necessary to comply with this order.

I note that because this population cap is necessary in light of the totality of conditions at MCCI, a substantial change in these conditions may lead to modification of my order in this regard. In particular, modification of this cap might be appropriate if and when changes in the physical plant and staff at MCCI would permit one hour of daily recreation per inmate in an enlarged space on a year round basis and full compliance with the other provisions of my order even at an increased population at the jail.

APPENDIX A–1

Cell Blocks A–1, A–2, B–1, B–2

| | Master Sleeping | Living | Plaintiff Sleeping | Living | State Sleeping | Living |
|---|---|---|---|---|---|---|
| Single Celled (Plaintiff's population) | 47 sq. ft. | 91 sq. ft. | 47 sq. ft. | 44 sq. ft. | | |
| ¾ Double Celled (Master's population) | approx. 26.5 sq. ft. | approx. 34 sq. ft. | 23.5 sq. ft. | 25 sq. ft. | | |
| Double Celled (State's population) | 23.5 sq. ft. | 30 sq. ft. | 23.5 sq. ft. | 22 sq. ft. | 23.5 sq. ft. | 45.4 sq. ft. |

Dormitories C–1, C–2, D–1, D–2, E–1, E–2, F–1, F–2

| | Master Sleeping | Living | Plaintiff Sleeping | Living | State Sleeping | Living |
|---|---|---|---|---|---|---|
| Plaintiff's population | 26 sq. ft. | 36 sq. ft. | 52 sq. ft. | 20 sq. ft. | | |
| Master's population | | | 26 sq. ft. | 10 sq. ft. | | |
| State's population | | | 20 sq. ft. | 8 sq. ft. | 22.8 sq. ft. | 30.8 sq. ft. |

APPENDIX A–2

### Trustee Dormitories

| | Master | Plaintiff | State |
|---|---|---|---|
| Plaintiff's population | | 51.3 sq. ft. | |
| Master's population | | 32 sq. ft | |
| State's population | 26 sq. ft. | 26 sq. ft. | |

### Civil–1

| | Master* Sleeping | Living | Plaintiff Sleeping | Living | State Sleeping | Living |
|---|---|---|---|---|---|---|
| Single Celled (Plaintiff's population) | | | 86.6 sq. ft. | 49 sq. ft. | | |
| ½ Double Celled (Master's population) | | | 43.3 sq. ft. | 32.5 sq. ft. | | |
| Double Celled (State's population) | | | 43.3 sq. ft. | 24 sq. ft. | 43.3 sq. ft. | 67.6 sq. ft. |

* The Master's calculations are based on the combined figures for Civil–1 and Civil–2. The Master calculates 86 sq. ft. of sleeping space and 140 sq. ft. of living space at plaintiff's proposed population and 43 sq. ft. of sleeping space and 70 sq. ft. of living space at the State's proposed population.

APPENDIX A–3

### Civil–2 (3 sections)

| | Plaintiff Sleeping (1) | (2) | (3) | Living (1) | (2) | (3) | State Sleeping (1) | (2) | (3) | Living (1) | (2) | (3) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Single celled (Plaintiff's pop) | 86.6 sq. ft. | 86.6 sq. ft. | 86.6 sq. ft. | 59 sq. ft. | 61 sq. ft. | 47 sq. ft. | | | | | | |
| ½ Double celled (Master's pop) | 43.3 sq. ft. | 43.3 sq. ft. | 43.3 sq. ft. | 39 sq. ft. | 41 sq. ft. | 32 sq. ft. | | | | | | |
| Double celled (State's pop) | 43.3 sq. ft. | 43.3 sq. ft. | 43.3 sq. ft. | 29 sq. ft. | 31 sq. ft. | 24 sq. ft. | 43.3 sq. ft. | 43.3 sq. ft. | 43.3 sq. ft. | 72.69 sq. ft. | 73.75 sq. ft. | 66.9 sq. ft. |